No. 25-4161

———————————————————————

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————————————————

CASCADIA WILDLANDS and OREGON WILD,
*Plaintiffs-Appellees*,

v.

CHERYL ADCOCK and UNITED STATES BUREAU OF LAND
MANAGEMENT
*Defendants-Appellants*.

———————————————————————

On Appeal from the United States District Court for the District of Oregon,
No. 6:22-cv-01344-MTK

———————————————————————

## BRIEF OF *AMICI CURIAE* NATURAL RESOURCES LAW PROFESSORS IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

———————————————————————

SARAH A. MATSUMOTO
OSB #111235, CO #52169
University of Colorado Law School
Getches-Green Natural Resources,
Energy & Environmental Law Clinic
2450 Kittredge Loop Rd.
Boulder, CO 80309
Tel: 206-351-5515
sarah.matsumoto@colorado.edu

*Counsel for Amici Curiae Natural*
*Resources Law Professors*

April 22, 2026

## TABLE OF CONTENTS

Table of Authorities ................................................................................. iii

Amici Curiae's Statement of Identity and Interest ................................ vii

Introduction .............................................................................................1

Argument ................................................................................................4

I.    Congress enacted NEPA to ensure federal agencies consider the environmental consequences of their proposed actions. ............................4

II.    Courts have long recognized an agency's obligation to take a "hard look" at the environmental consequences of its proposed actions. ......................7

A. In NEPA cases, courts review challenged agency actions pursuant to the standards laid out in the Administrative Procedure Act............................7

B. Courts began using the "hard look" standard in NEPA cases shortly after NEPA's enactment. ...............................................................................9

III.    The Ninth Circuit has consistently harmonized the application of the "hard look" standard and deference to discretionary agency actions in NEPA cases. ............................................................................................11

IV.    The Seven County decision did not upend the long history of courts reviewing NEPA challenges under the APA...........................................14

A. The *Seven County* decision did not overrule the "hard look" doctrine....14

B. The Seven County decision did not alter the "arbitrary and capricious" standard articulated by *State Farm*........................................................17

C. Decisions following *Seven County* illustrate how the "hard look" doctrine is still appropriate in NEPA cases. .........................................................19

V.    BLM Did Not Satisfy the "Hard Look" Standard in the Siuslaw Project EA and Subsequent FONSI....................................................................20

A. An agency's substantive obligations under FLPMA influence its duties under NEPA...........................................................................................22

B. An agency must conduct an additional site-specific NEPA analysis when it tiers to a programmatic EIS's or EA's general statements. ...............24

C. An agency must consider potentially significant cumulative effects in its EA..........................................................................................................26

Conclusion ............................................................................................................28

Appendix: List of Amici Natural Resources Law Professors ...............................30

Certificate of Compliance .....................................................................................31

Certificate of Service ............................................................................................32

## TABLE OF AUTHORITIES

**Cases**

*Aberdeen & Rockfish Ry. Co. v. Students Challenging Regulatory Agency Procs.*,
422 U.S. 289 (S.C. 1975)..................................................................................10

*Anacostia Watershed Soc'y v. Babbitt*,
871 F. Supp. 474 (D.D.C. 1994)..........................................................................8

*Blue Mountains Biodiversity Project v. Blackwood*,
161 F.3d 1208 (9th Cir. 1998) ............................................................................5

*California v. Block*,
690 F.2d 753 (9th Cir. 1982) ..............................................................................5

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm.*,
449 F.2d 1109 (D.C. Cir. 1971)....................................................................4, 15

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
811 F. Supp. 3d 1206 (D. Mont. 2025)..............................................................19

*Clinch Coal. v. Damon*,
316 F. Supp. 2d 364 (W.D. Va. 2004)..................................................................9

*Curry v. U.S. Forest Serv.*,
988 F. Supp. 541 (W.D. Pa. 1997) .......................................................................9

*Forest Guardians v. U.S. Fish and Wildlife Serv.*,
611 F.3d 692 (10th Cir. 2010) ..........................................................................11

*Friends of Animals v. Burgum*,
164 F.4th 738 (9th Cir. 2026) ...........................................................................19

*Friends of Yosemite Valley v. Norton*,
348 F.3d 789 (9th Cir. 2003) ............................................................................18

*Idaho Sporting Cong. v. Rittenhouse*,
305 F.3d 957 (9th Cir. 2002) ..................................................................... 11-12

*Klamath-Siskiyou Wildlands Ctr. v. BLM*,
    387 F.3d 989 (9th Cir. 2004) ...................................................................25, 26

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976)...................................................4, 7, 10, 11, 14, 15

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005). ....................................................................27

*Loper Bright Enter. v. Raimondo*,
    603 U.S. 369 (2024)...................................................................................18

*Maryland-Natl. Capital Park and Plan. Comm'n v. U.S. Postal Serv.*,
    487 F.2d 1029 (D.C. Cir. 1973)...................................................................10

*McDowell v. Schlesinger*,
    404 F. Supp 221 (W.D. Mo. 1975) ............................................................10

*Montana Wildlife Fedn. v. Haaland*,
    127 F.4th 1 (9th Cir. 2025) ...........................................................................5

*Motor Vehicle Mfrs. Ass'n. of the U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*,
    463 U.S. 29 (1983).........................................................................................8

*Native Ecosystems Council v. Marten*,
    883 F.3d 783 (9th Cir. 2018) .......................................................................13

*Native Ecosystems Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir. 2005) .....................................................................11

*Natural Res. Def. Council, Inc. v. Morton*,
    458 F.2d 827 (D.C. Cir. 1972).......................................................................9

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
    137 F.3d 1372 (9th Cir. 1998) .....................................................................27

*Ocean Advoc. v. U.S. Army Corps of Eng'rs*,
    402 F.3d 846 (9th Cir. 2005) .......................................................................24

*Oregon Nat. Desert Ass'n v. BLM*,
625 F.3d 1092 (9th Cir. 2010) ...................................................................22, 24

*Oregon Nat. Desert Ass'n v. Rose*,
921 F.3d 1185 (9th Cir. 2019) .........................................................................12

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)...............................................................4, 10, 11, 14, 15

*Sec. And Exch. Comm. v. Chenery Corp.*,
332 U.S. 194 (1947) .........................................................................................8

*Seven Cnty. Infrastructure Coalition v. Eagle Cnty., Colorado*,
605 U.S. 168 (2025)............................................................ 1-3, 14-18, 20-22, 28

*S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dept. of Interior*,
588 F.3d 718 (9th Cir. 2009) ..........................................................................25

*Surfrider Found. v. Dalton*,
989 F. Supp. 1309 (S.D. Cal. 1998)..................................................................8

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dept. of Interior*,
608 F.3d 592 (9th Cir. 2010) ..................................................................... 26-27

*Westlands Water Dist. v. U.S. Dept. of Interior*,
376 F.3d 853 (9th Cir. 2004) ........................................................................22

*WildEarth Guardians v. Montana Snowmobile Ass'n*,
790 F.3d 920 (9th Cir. 2015) ...................................................................... 13-14

*WildEarth Guardians v. U.S. Dept. of Agric. Animal and Plant Health Inspection Serv. Wildlife Services*,
135 F.4th 717 (9th Cir. 2025) ...........................................................................6

**Statutes**

5 U.S.C. 706(2)(A).............................................................................................7

42 U.S.C. § 4331 ........................................................................................1, 4, 5

42 U.S.C. § 4331(a) ..........................................................................................6

v

42 U.S.C. §§ 4332(A), (D)-(F), and (K) ...................................................................6

42 U.S.C. § 4332(C)........................................................................................6, 17

42 U.S.C. § 4332(C)(v) ............................................................................................6

42 U.S.C. § 4336a ....................................................................................................7

42 U.S.C. § 4336(b)(2).........................................................................................6, 7

43 U.S.C. § 1702(c) ...............................................................................................23

43 U.S.C. § 1711(a) ...............................................................................................23

43 U.S.C. § 1712(a) ...............................................................................................22

43 U.S.C. § 1712(c) ...............................................................................................23

43 U.S.C. § 1712(c)(4)...........................................................................................23

43 U.S.C. § 1732(a) ..........................................................................................22, 23

## Regulations

40 C.F.R. § 1501.11(b) .....................................................................................24, 25

40 C.F.R. § 1508.8(a)-(b)......................................................................................12

40 C.F.R. § 1508.7 ...........................................................................................12, 26

40 C.F.R. § 1508.13 .................................................................................................6

40 C.F.R. § 1508.27 ...............................................................................................24

## Other Authorities

*The Biden Administration's Executive Overreach and its Impact on American Energy Independence*: Hearing Before the S. Comm. Oversight and Investigations of the H. Comm. on Natural Resources, 118 Cong. 10-11 (2023) (Statement of Jamie Pleune, Professor of Law, S.J. Quinney College of Law)...............................5

Conference Report on NEPA, 115 Cong.Rec. 40416 (1969) ..................................4

John C. Ruple et. al., *Evidence-Based Recommendations for Improving National Environmental Policy Act Implementation*, 47 Col. L. Rev. 273 (2022). ...............18

S.Rep. No.91-296.....................................................................................................7

115 Cong.Rec. 29052-29053, 29055, 29058, 40416 (1969) ...................................7

## *AMICI CURIAE'S* STATEMENT OF IDENTITY AND INTEREST

*Amici curiae* are law school professors and legal scholars who are experts in the fields of public lands, natural resources, and administrative law. They have written, published, and practiced extensively in these fields. Through their scholarship and teaching, they promote understanding of environmental decision making and the laws governing the administration of public lands and natural resources.

This case presents questions about the role of a reviewing court in determining whether an agency took a "hard look" while conducting a NEPA analysis. Central to this case's resolution is an understanding of the history and purpose of NEPA and the role of judicial deference to agency decisions after the Supreme Court's decision in *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168 (2025). *Amici curiae* are uniquely situated to assist this Court in resolving this case.

Pursuant to Fed. R. App. P. 29(a)(4)(D)-(E), *amici* file this brief with the consent of the parties. No parties' counsel authored this brief in whole or in part, and no person—including any party or parties' counsel—funded the preparation and submission of this brief. An appendix listing the names of *amici* law professors is included after the conclusion of this brief. The *amici* law professors sign this brief in their individual capacities and not as representatives of their respective institutions. Additionally, Colorado Law students Piper Lacy, Lex Padilla, Joe Lynch, and Kayla

vii

Krulee received course credit for their work in support of this brief, and *amici* appreciate their efforts.

viii

**INTRODUCTION**

Congress enacted the National Environmental Policy Act ("NEPA") in 1969 and declared as national policy that the Federal Government will use "all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony." 42 U.S.C. § 4331(a). To effectuate these important goals for the benefit of current and future generations, NEPA requires that federal agencies make well-informed, transparent decisions before making an "irreversible and irretrievable" commitment of resources that may significantly affect the environment. For over five decades, courts have enforced NEPA's "action-forcing" procedures by requiring agencies to take a "hard look" at the environmental consequences of their actions. During that time, Congress has never amended the basic policy goals and mandates of NEPA. To the contrary, as recently as 2023 and 2025, Congress revisited and amended this bedrock law and left intact the nation's commitment to careful environmental review.

In 2025, the Supreme Court took up a case involving a large infrastructure project—a new railroad line from the Uintah Basin in Utah that would transport crude oil and connect with an existing rail line in Colorado that leads to refineries along the Gulf Coast. *Seven Cnty. Infrastructure Coalition v. Eagle Cnty., Colorado*, 605 U.S. 168 (2025). In *Seven County*, the Supreme Court addressed a narrow issue—whether the National Environmental Policy Act requires an agency to study

1

environmental impacts beyond the proximate effects of the action over which the agency has regulatory authority. *Id.* at 175–76, 187–88. The Supreme Court reiterated the traditional role of courts in reviewing NEPA documents under the Administrative Procedure Act—*i.e.*, that courts should apply the principles of deference to discretionary judgments made by federal agencies. *Id.* at 179. And it then held that agencies do not need to consider the indirect effects of other projects that are separate in time and place from the proposed project, especially when those other projects fall outside the jurisdiction of the action agency. *Id.* at 188–89.

In this case, however, the arguments of Appellants and the American Forest Resource Council would stretch the holding of *Seven County* well beyond reasonable bounds and, in doing so, would undermine the statutory requirements and policy objectives that Congress recently reaffirmed. They latch on to the Supreme Court's language regarding deference to discretionary decisions and attempt to undermine what federal courts have long held to be mandatory requirements.

For example, a bedrock principle of NEPA is that agencies may tier to broad programmatic analyses but must then include site specific and detailed information prior to approving individual projects like the ones at issue in this case. This is not a discretionary requirement. In this case, the District Court properly concluded that BLM has never provided the mandatory site-specific analysis of environmental effects.

Similarly, BLM attempts to use *Seven County* to evade the long-standing, mandatory requirement that agencies disclose and consider the cumulative effects of the proposed project in combination with other projects that same agency is planning concurrently that overlap in time and space with the project at issue. Here, Appellants were simultaneously planning timber projects in the same region of the forest and yet did not disclose to the public and analyze the combined, cumulative effects of those projects. Federal courts have regularly enforced this mandatory, non-discretionary requirement of NEPA and should continue to do so. The facts here regarding cumulative effects are far different than the indirect effects at issue in *Seven County* where upstream and downstream projects were hundreds or thousands of miles away and under the jurisdiction of entirely separate governmental authorities.

*Seven County* serves as an important reminder for federal courts when they are reviewing the exercise of agency discretion under NEPA, but it did not amend the statute, overrule any prior precedent, or in any other way alter what have long been held to be mandatory requirements that agencies consider and disclose site specific direct and cumulative impacts from discrete projects like the timber sales at issue in this case. This Court should reject the invitation from BLM and American Forest Resource Council to undermine our nation's bedrock commitment to informed agency decision-making and public participation.

## ARGUMENT

**I. Congress enacted NEPA to ensure federal agencies consider the environmental consequences of their proposed actions.**

Congress enacted NEPA in 1969, and it embodies our nation's foundational commitment to integrating environmental considerations into all federal decision-making processes. *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm.*, 449 F.2d 1109 (D.C. Cir. 1971). It remains as "the broadest and perhaps most important" of the environmental statutes. *Id*. at 1111.

The stated purpose of NEPA, 42 U.S.C. § 4331, made clear that Congress's mission was to

> [D]eclare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

Congress intended NEPA's "action-enforcing" provisions to act as a directive to all agencies to ensure that agency decision-making would be well-informed and deliberative. *Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976) (citing Conference Report on NEPA, 115 Cong.Rec. 40416 (1969)).

Although NEPA does not mandate a particular outcome, courts have recognized that NEPA's requirements are "almost certain" to influence an agency's substantive decision. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332

4

(1989). Often, NEPA's procedural requirements lead to better-informed decisions than a rushed or incomplete process otherwise would. *The Biden Administration's Executive Overreach and its Impact on American Energy Independence*: Hearing Before the S. Comm. Oversight and Investigations of the H. Comm. on Natural Resources, 118 Cong. 10-11 (2023) (Statement of Jamie Pleune, Professor of Law, S.J. Quinney College of Law). Where federal agencies have rushed decisions or cut corners, projects have resulted in unreasonable degradation of the environment and human health. *Id*.

NEPA's procedural requirements also ensure that the public has an opportunity to engage in the decision-making process. *See Montana Wildlife Fedn. v. Haaland*, 127 F.4th 1, 38 (9th Cir. 2025) (requiring "sufficien[t] [time] to permit members of the public to weigh in on the decision in an informed manner."). Public notice and public participation "are at the heart of the NEPA review process," because it reflects Congress's intent to "internalize opposing viewpoints into the decision-making process" to ensure that agencies are informed of all environmental trade-offs in a project. *California v. Block*, 690 F.2d 753, 770–71 (9th Cir. 1982). This is precisely what Congress envisioned when it enacted the statute in 1969—to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable or unintended consequences." 42 U.S.C. § 4331.

5

Section 102 of NEPA imposes rigorous, mandatory procedures on federal agencies. Congress "directs and authorizes" agencies to consider environmental factors such as reasonably foreseeable effects and ecological information, to make use of and ensure the integrity of reliable data and resources, and to explicitly balance those values against economic and technical benefits. *See* 42 U.S.C. § 4332(A), (D)–(F), and (K). Agencies must prepare a "detailed statement" in the form of an Environmental Impact Statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Before preparing an EIS, agencies may conduct an Environmental Assessment ("EA"), a concise, threshold-level review used to determine whether a proposed federal action is likely to have significant environmental impacts. 42 U.S.C. § 4336(b)(2). In short, an EA is a screening tool to decide whether impacts rise to the level requiring an EIS. If the agency decides not to prepare an EIS, it must provide a "convincing statement of reasons" to explain why in a Finding of No Significant Impact ("FONSI"). 40 C.F.R. § 1508.13; *WildEarth Guardians v. U.S. Dept. of Agric. Animal & Plant Health Inspection Serv. Wildlife Services*, 135 F.4th 717, 728 (9th Cir. 2025). Important to this case, NEPA requires a "detailed statement" when a "major federal action significantly affects" "any irreversible and irretrievable...resource." 42 U.S.C. § 4332(C)(v). "By requiring an impact statement Congress intended to assure such consideration during the development of a

proposal or as in this case during the formulation of a position on a proposal submitted by private parties." *Kleppe*, 427 U.S. at 409 (citing S.Rep. No.91-296 at 2, 20-21; 115 Cong.Rec. 29052-29053, 29055, 29058, 40416 (1969)).

Just a few years ago, in the Fiscal Responsibility Act of 2023, Congress reaffirmed the nation's commitment to the policies and requirements of NEPA when it updated the statute. The 2023 updates built on the foundational requirements and provided additional detail for agencies. For example, the statutory updates include definitions of "Environmental Impact Statement" and "Environmental Assessment" and include guidelines on page limits and timelines. 42 U.S.C. §§ 4336(b)(1)-(2), 4336a(e), (g) (2023). Many of these amendments enshrined in the statute stem from regulations and practice that had become standard components of the NEPA process. While the decision at issue in this case preceded the 2023 amendments to the statute, Congress' decision to clarify and build on the basic requirements from 1969 can help guide this Court's analysis of Appellants' arguments.

**II.    Courts have long recognized an agency's obligation to take a "hard look" at the environmental consequences of its proposed actions.**

**A.    In NEPA cases, courts review challenged agency actions pursuant to the standards laid out in the Administrative Procedure Act.**

Federal courts routinely review challenges to environmental review documents pursuant to the requirements of the Administrative Procedure Act ("APA"). Pursuant to 5 U.S.C. § 706(2)(A), courts will determine whether an

agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The arbitrary and capricious standard was explained in *Motor Vehicle Manufacturers Ass'n of the U.S., Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 42–43 (1983). An agency action is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 43. A reviewing court is limited to the explanation provided by the agency and "should not attempt itself to make up for such deficiencies: we may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (quoting *Sec. & Exch. Comm. v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Courts have reaffirmed the applicability of the "arbitrary and capricious" standard to NEPA documents and agency findings to ensure that agencies have complied with the mandatory requirements of NEPA. With respect to FONSIs—the agency's determination that a proposed action does not require preparation of an EIS—courts have long held that the question of whether an agency properly relied on an EA and a FONSI rather than preparing a full EIS is subject to arbitrary and capricious review. *See Anacostia Watershed Soc'y v. Babbitt*, 871 F. Supp. 475, 482 n.4 (D.D.C. 1994); *Surfrider Found. v. Dalton*, 989 F. Supp. 1309, 1318 (S.D. Cal.

8

1998) ("[A]n agency's NEPA actions...are reviewed under the arbitrary and capricious standard of § 706(2)(A) of the [APA].").

The standard also applies to cases where the Court reviews the mandatory components of NEPA analyses, including cumulative-effects evaluations, the range of reasonable alternatives, and other analytical elements of EAs and EISs. *Clinch Coal. v. Damon*, 316 F. Supp. 2d 364, 385 (W.D. Va. 2004) ("An agency's consideration of cumulative impacts is part of the agency's required 'hard look;' therefore, such consideration is assessed under the same arbitrary and capricious standard."); *Curry v. U.S. Forest Serv.*, 988 F. Supp. 541, 554 (W.D. Pa. 1997) (finding that the Forest Service's failure to consider more than two alternatives in connection with the project at issue was arbitrary and capricious).

**B.     Courts began using the "hard look" standard in NEPA cases shortly after NEPA's enactment.**

The earliest application of the "hard look" standard to a NEPA case appears to be in *Natural Resource Defense Council, Inc. v. Morton*, 458 F.2d 827 (1972). Drawing from cases challenging Federal Communications Commission actions, the D.C. Circuit offered a "final word" about the function of courts and agencies: a court need not insert itself within the area of an agency's discretion "[s]o long as the officials and agencies have taken the 'hard look' at environmental consequences mandated by Congress...[.]" *Id*. at 838. Following *Morton*, the "hard look" standard was quickly acknowledged and applied in the NEPA context by other courts. *See,*

9

*e.g.*, *Maryland-Natl. Capital Park and Plan. Comm'n v. U.S. Postal Serv.*, 487 F.2d 1029 (D.C. Cir. 1973) (finding that the agency did not contemplate a "substantial inquiry" or "hard look" under NEPA); *Aberdeen & Rockfish R. Co. v. Students Challenging Regul. Agency Procs.*, 422 U.S. 289 (S.C. 1975) (finding that NEPA required the Commission's "hard look" at environmental matters and impact statements); *McDowell v. Schlesinger*, 404 F. Supp 221 (W.D. Mo. 1975) (finding that agency must take a hard look at all environmental potential impacts, including secondary impacts, flowing from the proposed action).

The Supreme Court applied the hard look standard in the first NEPA cases it considered. In *Kleppe v. Sierra Club*, the Supreme Court maintained that neither NEPA nor its legislative history intended for a reviewing court to substitute its judgment for an agency's with respect to the environmental consequences of its actions. 427 U.S. at 410 n. 21. Regardless, the Court held that a reviewing court's role is to "ensure that the agency has taken a 'hard look' at environmental consequences." *Id.* The Supreme Court again upheld the agency's responsibility to take a "hard look" in *Robertson v. Methow Valley*. There, the Court recognized that, "[t]he sweeping policy goals announced in § 101 of NEPA are thus realized through a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences and that provide for broad dissemination of relevant

10

environmental information." *Robertson*, 490 U.S. at 350 (quoting *Kleppe*, 427 U.S. at 410 n. 21).

Over the last five decades, the hard look standard thus evolved as a mechanism for ensuring meaningful NEPA compliance while maintaining deference to agency expertise. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233 (9th Cir. 2005) ("[d]etermining whether the Forest Service took the requisite 'hard look' is judged against the APA's arbitrary and capricious standard."). Courts did not need to choose between one or the other. *See Forest Guardians v. U.S. Fish and Wildlife Serv.* 611 F.3d 692 (10th Cir. 2010) (upholding a "presumption of validity to the agency action" while still affirming the hard look doctrine).

Accordingly, when an agency was able to show, based on the record, that it took a "hard look" at environmental consequences and made a rational decision, it was entitled to deference. Even though NEPA doesn't prohibit unwise agency action, it does prohibit uninformed agency action. *See Robertson*, 490 U.S. at 350.

**III.** **The Ninth Circuit has consistently harmonized the application of the "hard look" standard and deference to discretionary agency actions in NEPA cases.**

The Ninth Circuit has followed the Supreme Court's lead in requiring agencies to take a "hard look" at the environmental effects of their actions. *See Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002). When taking a "hard look," the Ninth Circuit has held that agencies must consider all foreseeable

11

direct and indirect effects as well as cumulative impacts. *Id.* For reference, "direct effects" are those that "occur at the same time and place" while "indirect effects" include those that "are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(a)–(b).[1] Meanwhile, "[c]umulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

The Ninth Circuit has repeatedly maintained that "general statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification" for why an agency could not supply more "definitive information." *Oregon Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019); *see also Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998). For example, in *Oregon Natural Desert Ass'n v. Rose*, the Court found that the BLM failed to take a "hard look" because the EA at issue and the EIS to which it was tiered contained "only a cursory analysis of the project's impact on noteworthy aspects" of the proposed project area and lacked any justification as to why the BLM could not provide more definitive information. *Id*. at 1191. Taken together, these cases establish not only what the "hard look" requires, but also the kinds of analytical failures that fall short under the arbitrary and capricious standard of review.

---

[1] Unless otherwise specified, this brief cites to the 1978 version of the Council on Environmental Quality's ("CEQ") NEPA regulations, as those regulations were in effect at the time of BLM's preparation of the Siuslaw Plan.

Building on that foundation, this Circuit has identified failures that cross the line from permissibly unwise to impermissibly uninformed agency action. For example, this Court has held that an agency may not rely on incorrect assumptions or data, or fail to provide information "so incomplete or misleading that the decisionmaker and the public could not make an informed comparison of alternatives"; to do so would "constitut[e] a failure to meet the hard look obligation and violat[e] NEPA." *Native Ecosystems Council v. Marten*, 883 F.3d 783, 795 (9th Cir. 2018); *see also WildEarth Guardians v. Montana Snowmobile Ass'n*, 790 F.3d 920, 926 (9th Cir. 2015) ("It surely follows that [any] data [an agency] provides to the public to substantiate its analysis and conclusions must also be accurate."). For example, in *WildEarth Guardians v. Montana Snowmobile Ass'n*, the Ninth Circuit found that the EIS prepared by the Forest Service failed to comply with NEPA's requirements. 790 F.3d at 926. In particular, the Forest Service failed to demonstrate to the court that it took the requisite "hard look" at the project's effects when it relied on a "wolverine habitat prediction" map as the baseline for big game winter range impacts without disclosing why in the EIS. *Id*. at 926. The map, which appeared only in an appendix on wolverine denning habitat, neither identified big game winter range nor accurately depicted it. *Id*. The Forest Service admitted it ultimately relied on updated Montana Fish, Wildlife & Parks maps that were never included or referenced in the EIS. *Id*. Because NEPA requires agencies to base their analysis and

13

public disclosure on accurate data, the court concluded that the Forest Service had violated NEPA. *Id.*

**IV.    The Seven County decision did not upend the long history of courts reviewing NEPA challenges under the APA.**

The Supreme Court's *Seven County* decision examined the scope of indirect effects to include in an EIS and emphasized that courts should show deference to an agency's indirect effects determinations in its EIS. However, *Seven County* did not eliminate the requirement that agencies take a "hard look" when conducting NEPA analyses, and it did not redefine arbitrary and capricious review under the APA. *See Seven County*, 605 U.S. at 180, 197–98. *Seven County* fits squarely within the extensive history of judicial review under NEPA and the APA, which has afforded agencies significant deference while still requiring agencies to take the mandatory hard look "to assure consideration of the environmental impact of their actions in decisionmaking." *See Kleppe*, 427 U.S. at 409; *see also Robertson*, 430 U.S. at 351; *Marsh*, 490 U.S. at 375.

**A. The *Seven County* decision did not overrule the "hard look" doctrine.**

BLM overextends *Seven County* in suggesting that it overruled the "hard look" standard. Br. of Appellant at 29 ("Even assuming the hard-look standard is not obsolete after *Seven County*'s course correction . . .[.]"). While the *Seven County* decision emphasized that courts should show deference to agency discretion and

14

expertise; it did not, as BLM posits, overrule decades of precedent requiring agencies to take a "hard look" at environmental consequences. *Seven County*, 605 U.S. at 197–98. The Court reiterated what courts have long recognized: that NEPA "ensures that the agency and the public are aware of the environmental consequences of proposed projects" and that "NEPA helps agencies to make better decisions and [] ensure[s] good project management." *Id.* at 177; *see also Kleppe*, 427 U.S. at 409; *Calvert Cliffs'*, 449 F.2d at 1113; *Robertson*, 490 U.S. at 349.

In *Seven County*, the Supreme Court focused on the narrow issue of the appropriate scope of indirect effects that an agency must consider in its EIS. At issue in this case was the U. S. Surface Transportation Board's EIS for the Uinta Basin Railway project, an 88-mile railroad line in northeastern Utah. *Seven County*, 605 U.S. at 173. The Court reviewed the D.C. Circuit's finding that the Board's EIS was incomplete because the Board did not consider "the environmental effects of upstream oil drilling or downstream oil refining." *Id*. at 174. The Supreme Court reversed and held that the Board was not required to consider environmental impacts from upstream and downstream projects that were "separate in time or place" from the proposed project in its EIS. *Id*. at 189.

In support of its decision, the Court pointed to the Board's well-reasoned justification for not considering upstream oil drilling in the Uinta Basin and downstream oil refining along the Gulf Coast of Louisiana and Texas. *Id*. at 173-76.

15

The Board's EIS explained that it did not include further environmental analysis of "potential future, as yet unplanned, oil and gas development projects" in part because the Board had "no authority or control over potential future oil and gas development." *Id.* at 175 (internal quotations omitted). The EIS stated that the "proposed rail line and any future oil and gas development projects are not two phases of a single action, but separate, independent projects." *Id.* at 186 (internal quotations omitted). Based on this explanation, the Court found that the Board's "final decision was reasonable and reasonably explained" and thus was entitled to deference. *Id.* at 185, 191.

The Court held that when it comes to *indirect effects*, "*[s]o long as the EIS addresses environmental effects from the project at issue*, courts should defer to agencies' decisions about where to draw the line" when deciding "how far to go in considering indirect environmental effects from the project at hand" as well as "whether to analyze environmental effects from other projects separate in time or place from the project at hand." *Id.* at 182 (emphasis added). The Court reasoned that "the project at issue was an 88-mile railroad line, not an oil well or a drilling permit in the Uinta Basin" and that "the environmental effects of future oil and gas development in the Basin are 'speculative' and attenuated from the project at hand." *Id.* at 175-76. The Court emphasized the unique circumstances of the case at hand and clarified that agencies would still have to consider indirect effects in other cases with different facts. *Id.* at 187. Justice Kavanaugh explained:

16

> To be clear, the environmental effects of the project at issue may fall within NEPA even if those effects might extend outside the geographical territory of the project or might materialize later in time— for example, run-off into a river that flows many miles from the project and affects fish populations elsewhere, or emissions that travel downwind and predictably pollute other areas.

*Id.*

### B. The Seven County decision did not alter the "arbitrary and capricious" standard articulated by *State Farm*.

The *Seven County* decision reaffirmed that courts should apply the arbitrary and capricious inquiry articulated by *State Farm* when reviewing an agency's exercise of "discretion granted by the statute." *Id.* at 179-80 ("[W]hen an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard.").

The *Seven County* court agreed that NEPA requires agencies to make well-informed decisions and to be fully aware of the environmental impacts of their decisions prior to irreversibly and irretrievably committing resources. *Seven County*, 605 U.S. at 197–98; s*ee also* 42 U.S.C. § 4332(c). Even while calling for courts to show deference to an agency's factual findings and technical expertise, *Seven County* acknowledged that courts should not grant blanket deference. *Seven County*, 605 U.S. at 180. The Court affirmed that it is the role of federal courts to interpret NEPA's statutory mandates, such as "that the EIS should be 'detailed,'" explaining that "[o]f course, the meaning of 'detailed' is a question of law to be decided by a

17

court." *Id.* (quoting 42 U.S.C. § 4332(2)(C)). This is consistent with the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391–92 (2024), where the Court held that "[t]he APA thus codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment." When reviewing challenges to an agency's NEPA analysis, courts must remain faithful to Congress by not merely rubber stamping an agency's determination but by ensuring that the agency has in fact fulfilled its statutory duties. *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 793 (9th Cir. 2003). In sum, *Seven County* did not overrule the "hard look" standard or otherwise change the way federal courts are to review agency compliance with NEPA under the arbitrary and capricious standard of review.

While the *Seven County* decision laments how NEPA cases have "slowed down or blocked many projects," these policy concerns cannot displace the proper role of the federal court in ensuring that federal agencies comply with NEPA's procedural safeguards. Furthermore, empirical research suggests that the level of analysis, such as whether an agency conducts an EIS or an EA, is "an imperfect predictor of decision-making times." John C. Ruple et. al., *Evidence-Based Recommendations for Improving National Environmental Policy Act Implementation*, 47 Col. L. Rev. 273, 302 (2022). As a result, "reducing the level of analysis alone therefore does not guarantee a faster decision." *Id*. at 304. The policy

18

concerns identified by the Supreme Court are not necessarily being observed in practice and certainly do not warrant the kind of disregard for statutory law and Congressional policy as urged by Appellants and the American Forest Resource Council.

### C. Decisions following *Seven County* illustrate how the "hard look" doctrine is still appropriate in NEPA cases.

Recent cases exemplify how a court can afford an agency deference but still apply the "hard look" doctrine. *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, 811 F. Supp. 3d 1206, 1216 (D. Mont. 2025); *see also Friends of Animals v. Burgum*, 164 F.4th 738, 746 (9th Cir. 2026). In *Friends of Animals v. Burgum*, the court emphasized that "[a]s part of the EA, BLM was required to take a 'hard look' at the Project's environmental consequences." 164 F.4th at 750. Thus, contrary to Appellant's allegations, the Ninth Circuit recognizes that *Seven County* did not render the "hard look" standard obsolete. *Id.*

The district courts in this Circuit have continued to apply the "hard look" standard. In *Center for Biological Diversity v. U.S. Forest Service,* the Montana Federal District Court afforded the U.S. Forest Service (USFS) deference but vacated the agency's treatment plan because it did not meet its mandate under NEPA to take a "hard look." 811 F. Supp. 3d at 1216. The court explained that because the USFS did not sufficiently examine the impact of temporary roads on grizzly bear

19

habitat, the agency failed "to address an important aspect of the problem." *Id.* Basing its reasoning on the Supreme Court's recent statement in *Seven County* that the "goal of [NEPA] is to inform agency decision-making, not paralyze it," the District Court found that the "lack of specific road mapping [prevented] such informed decision-making." *Id.* at 1217.

## V.     BLM Did Not Satisfy the "Hard Look" Standard in the Siuslaw Project EA and FONSI.

Unlike in *Seven County*, there are no indirect effects "separate in time or place" at issue in this case. Rather, this case concerns BLM's failure to take a hard look at direct and cumulative impacts that are immediately connected, both in time and geographic location, to the Project.

As the Supreme Court made clear in *Seven County*, courts should show deference to an agency's expertise and fact finding; however, an agency cannot expect blind deference from a court when it has not provided a reasoned explanation to which the court can defer. *See* 605 U.S. at 180, 185. In *Seven County*, the Board provided sufficient evidence that it could not reasonably analyze the impacts of upstream and downstream projects that were too speculative, separate in time and place, and wholly independent from the project at issue. *Id.* at 175–176, 188. The Supreme Court deferred to the Board's decision to limit its analysis to exclude

20

indirect environmental impacts of upstream and downstream projects because the Board provided a thorough and well-reasoned explanation in its EIS. *Id.* at 191.

By contrast, here, BLM is asking the Ninth Circuit to defer to conclusory, generalized statements that lack sufficient detail and site specificity. 1-ER-24. As appellees discuss, BLM did not take a "hard look" because it failed to conduct the site-specific analysis that has always been and still is required by the statutory directives of NEPA. Br. of Appellees at 30, 40.

More specifically, in the Siuslaw Plan EA, BLM did not include detailed consideration of forty-two out of forty-seven potentially significant environmental issues. 3-ER-172–75. One particularly illustrative example is BLM's failure to consider in detail soil disturbances, including soil erosion, that would result from logging operations. *Id.* Soil disturbance resulting from the project at issue is exactly the kind of effect that *Seven County* highlighted as being essential for an agency to analyze comprehensively to satisfy NEPA. 605 U.S. at 189. In *Seven County*, the Supreme Court explained that the Board needed to "consider the environmental effects of th[e] 88-mile railroad line's construction and operation" to satisfy NEPA. *Id.* Specifically, when discussing the agency's responsibility to analyze the project's direct effects, Justice Kavanaugh clarified, "[t]o the extent that the new 88-mile railroad line could disrupt the habitat of protected species, or the new rail embankments could cause soil erosion into local bodies of water, or trains on the

21

new line could pollute the air, NEPA dictated that the Board evaluate those effects."

*Id.*

## A. An agency's substantive obligations under FLPMA influence its duties under NEPA.

When considering whether an agency has taken a "hard look," courts will look to see whether the agency complied with the mandatory requirements of other statutes, such as the Federal Land Policy and Management Act ("FLPMA"). *See Westlands Water Dist. v. U.S. Dept. of Interior,* 376 F.3d 853, 866 (9th Cir. 2004) ("[w]here an action is taken pursuant to a specific statute, the statutory objectives of the project serve as a guide by which to determine the reasonableness of objectives outlined in an EIS."). In other words, when a proposed action is driven by a substantive statute, an adequate NEPA analysis must take into consideration the relevant analyses underlying that statute. *See Oregon Nat. Desert Ass'n v. BLM* ("ONDA v. BLM"), 625 F.3d 1092 (9th Cir. 2010).

FLPMA charges BLM with developing resource management plans ("RMPs") according to the principles of "multiple use and sustained yield" and other statutorily mandated factors. 43 U.S.C. § 1712(a), (c). BLM must then "manage the public lands . . . in accordance with [those] land use plans." 43 U.S.C. §§ 1732(a). An RMP and any required subsequent NEPA document together provide BLM with a comprehensive framework for managing public lands. The statutory requirements of FLPMA to "develop management practices that ensure the long-term

22

sustainability of healthy and productive land" mandate that the EIS supporting the RMP must consider the land resources and values relevant to its long-term management strategy. *See* 43 U.S.C. §§ 1702(c), 1711(a), 1712(c)(4), 1732(a). In *ONDA v. BLM*, the court made clear that because the RMP evaluates wilderness characteristics pursuant to statutory mandates under FLPMA, an adequate EIS under NEPA must therefore evaluate wilderness characteristics as well. 625 F.3d at 1112.

In this case, BLM was required to analyze potential soil disturbances in each harvest unit area in order to comply with the 2016 RMP's 20% detrimental disturbance threshold. 1-ER-15 (citing 3-ER-387) ("Limit detrimental soil disturbance from forest management operations to a total of < 20 percent of the harvest unit area."). Instead of conducting site-specific soil analyses for each harvest unit area, BLM averaged predicted soil disturbance levels across the whole 13,225-acre Siuslaw Plan area, admitting that this methodology was essentially guesswork. *See* 1-ER-16; 3-ER-377–378; 3-SER-318. Using this haphazard approach, BLM could not accurately establish a baseline or reasonably predict the impacts of logging on each harvest unit area and has no way of knowing if it can comply with the 20% soil disturbance standard established by the 2016 RMP. *See* 1-ER-16 ("This averaging system distorted the data contained in the EA, rendering the resulting FONSI irrational and inadequate under NEPA.") Thus, BLM's approach did not constitute a "hard look" because its EA did not adequately assess soil disturbance

and other factors necessary to comply with the 2016 RMP. *See ONDA v. BLM*, 625 F.3d at 1110, 1112 (9th Cir. 2010).

In addition to missing the mark of its required "hard look," BLM's failure to adequately assess soil disturbance as required by the 2016 RMP gives rise to a different NEPA violation—the failure to prepare an Environmental Impact Statement. Section 1508.27(10) requires agencies to consider "[w]hether the action threatens a violation of federal, state, or local law or requirements imposed for the protection of the environment" in determining intensity in the context of significance for the purpose of determining whether an agency must conduct an EIS. 40 C.F.R. § 1508.27(10). This Court has held that just "one of these factors may be sufficient to require preparation of an EIS." *Ocean Advoc. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005). Cascadia argued—and the District Court agreed— that substantial questions exist regarding whether the Siuslaw Plan may have significant impacts under three intensity factors; a threatened violation of FLPMA would be a fourth. *See* 1-ER-28–29. This intensity factor further underscores the importance of agency compliance with FLMPA to satisfy its obligations under NEPA.

## B. An agency must conduct an additional site-specific NEPA analysis when it tiers to a programmatic EIS's or EA's general statements.

Section 1501.11 allows an agency to tier to an existing EIS when it is relevant to a later proposed action. 40 C.F.R. § 1501.11(b). Tiering is meant to allow an

24

agency to "eliminate repetitive discussions of the same issues, focus on the actual issues ripe for decision, and exclude from consideration issues already decided." *Id*. However, an agency's use of tiering is arbitrary and capricious when both the programmatic EIS or EA and the project-level NEPA document contain merely general statements about an issue rather than the requisite site-specific information. *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 997 (9th Cir. 2004). In *Klamath-Siskiyou Wildlands Ctr.*, BLM's RMP-EIS only contained general statements about the cumulative effects of logging across the district, and the EAs only contained general statements about the cumulative effects of logging in the affected watershed. *Id*. The court held that tiering the EAs to the RMP-EIS was insufficient under NEPA. *Id*. The court reasoned that "what is missing in the documentation, however, is any specific information about the cumulative effects." *Id*. In other words, the requisite site-specific analysis must be found either in the earlier or the subsequent NEPA analysis. *See S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dept. of Interior*, 588 F.3d 718, 726 (9th Cir. 2009) ("Though 'tiering' to a previous EIS is sometimes permissible, the previous document must actually discuss the impacts of the project at issue.").

In this case, BLM attempted to justify avoiding further analysis by tiering to the 2016 Final EIS ("FEIS"), which considered the overall impacts of the 2016 RMP across 2.5 million acres. 1-ER-6 (citing 3-SER-346). The FEIS generally assessed

25

standards and guidelines for a broad range of resources, but called for more detailed, site-specific analysis prior to the implementation of specific projects. 3-ER-379 ("[M]any factors which control soil disturbance can only be quantified at the project scale, including the impacts of logging system design and the use of design features, fuels treatment selection, best management practices, and ameliorative actions that would reduce soil disturbance (FEIS pg. 752)."); *see also* 3-ER-399 ("[T]he BLM does not have sufficient information to quantify detrimental soil disturbance … at [the FEIS] scale of analysis. That level of detail should occur at the project level analysis.").

Because the 2016 FEIS specifically requires further, site-specific analysis, BLM could not reasonably bypass a more detailed analysis in its EA by tiering to the 2016 FEIS. *See Klamath-Siskiyou*, 387 F.3d at 997. Therefore, without conducting site-specific analysis for potentially significant environmental impacts discussed in the 2016 RMP and failing to give a well-reasoned explanation as to why, BLM has not taken the "hard look" that decades of precedent and courts understand the APA to require.

## C. An agency must consider potentially significant cumulative effects in its EA.

As discussed above, an agency must address cumulative effects that "result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7; *see also Te-Moak Tribe of W. Shoshone of Nev.*

*v. U.S. Dept. Of Interior*, 608 F.3d 592, 603 (9th Cir. 2010). This Court has established that "[a]n EA's analysis of cumulative impacts 'must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment.'" *Id.* (citing *Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2005). This information is essential for assuring courts and the public "that the [agency] provided the hard look that it is required to provide." *Id.* (citing *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998)).

BLM failed to consider cumulative impacts of the Siuslaw Plan and the "N126" Project even though these projects "overlap in time and space" and the N126 EA and the Siuslaw Plan EA discuss some of the same environmental impacts. *See* 1-SER-24. These projects are immediately connected geographically—the Siuslaw Plan assigns many units for logging that are adjacent to areas of forest that the BLM has designated for commercial logging under the N126 Project. 3-SER-321. Because of this, the "projects will have significant cumulative effects on fish and wildlife, erosion and water quality, invasive species infestations, fire hazard, forest age and structural class, and wildlife habitat." Pls.' Mot. at 32; *see also* 3-SER-323–24; 3-ER-261; 3-ER-172–75. By failing to consider the cumulative impacts of the Siuslaw Plan and the N126 Project, BLM has not satisfied the "hard look" standard.

27

## CONCLUSION

Ultimately, *Seven County* did not overrule the basic requirements of NEPA that apply to this case. Despite BLM's attempts to overextend the narrow holding in *Seven County*, this case fits squarely within the long line of cases from this Circuit that have applied the arbitrary and capricious standard of review, have enforced the "hard look" requirement, and have deferred in appropriate ways to the agency's exercise of discretion and expertise. NEPA still requires agencies to conduct a detailed, site-specific analysis in its NEPA documents. Agencies must still ensure compliance with substantiative requirements of laws, such as FLPMA, when conducting a NEPA analysis. Simply tiering to a general, non-site-specific EIS does not fulfill an agency's duty to take a "hard look" and violates NEPA. In this case, BLM has failed to conduct a detailed analysis of the potential direct and cumulative effects of the Siuslaw Project and has not provided a reasonable explanation to which this Court can defer. Thus, we respectfully urge this Court to reject BLM's invitation to stretch *Seven County's* holding and reasoning beyond its logical bounds and instead affirm the decision below.

Respectfully submitted this 22nd day of April, 2026.

s/ Sarah A. Matsumoto
Sarah A. Matsumoto, OSB #111235, CO #52169
UNIVERSITY OF COLORADO LAW SCHOOL
GETCHES-GREEN NATURAL RESOURCES,
ENERGY & ENVIRONMENTAL LAW CLINIC

28

2450 Kittredge Loop Rd.
Boulder, CO 80309
Tel: 206-351-5515
sarah.matsumoto@colorado.edu


*Counsel for amici curiae Natural Resources Law Professors*

29

## APPENDIX: *AMICI* NATURAL RESOURCES LAW PROFESSORS

**Professional affiliations provided for identification purposes only.**

Christophe Courchesne
Associate Professor of Law
Associate Dean for Environmental and Experiential Programs and Director,
Environmental Law Center & Environmental Advocacy Clinic
Vermont Law and Graduate School

Joseph W. Dellapenna
Michigan State Bar #P12651

Noah Hall
Professor of Law
Wayne State University Law School

Anna Mance
Assistant Professor of Law
SMU Dedman School of Law

Sarah A. Matsumoto
Associate Professor of Clinical Law
University of Colorado Law School

Camille Pannu
Associate Clinic Professor of Law
Director, Environmental and Climate Justice Clinic
Columbia Law School

Patrick Parenteau
Professor of Law Emeritus
Senior Fellow for Climate Policy, Environmental Law Center
Vermont Law and Graduate School

Christopher G. Winter
Executive Director, Getches-Wilkinson Center
University of Colorado Law School

30

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-4161

I am the attorney or self-represented party.

**This brief contains** 6,997 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s Sarah Matsumoto     **Date** April 22, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

31

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Sarah A. Matsumoto
Sarah A. Matsumoto, OSB #111235, CO #52169

*Counsel for amici curiae Natural Resources Law Professors*

32